UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

————————————————————————————————

JOHN M. COUGHLIN,

                                        Plaintiff,

        v.                                                      5:06-CV-497
                                                               (NAM/GJD)

COMMISSIONER OF SOCIAL SECURITY,

                                        Defendant.

————————————————————————————————

HOWARD OLINSKY, ESQ., for Plaintiff
KARLA J. GWINN, Special Asst. U.S. Attorney for Defendant

GUSTAVE J. DI BIANCO, Magistrate Judge

## REPORT-RECOMMENDATION

        This matter was referred to me for report and recommendation by the Honorable

Norman A. Mordue, Chief United States District Judge, pursuant to 28 U.S.C. §

636(b) and Local Rule 72.3(d).  This case has proceeded in accordance with General

Order 18.

## PROCEDURAL HISTORY

        Plaintiff filed applications for disability insurance benefits and Supplemental

Security Income on August 23, 2002, alleging disability beginning June 5, 2001.

(Administrative Transcript ("T."), 52-54, 350-52).  The applications were initially

denied on November 26, 2002.  (T. 30-35, 353-58).  Plaintiff requested a hearing

before an Administrative Law Judge ("ALJ"), and a hearing was held on June 15,

2004.  (T. 39, 368-91).  At the hearing, plaintiff was the only witness to testify.  (*Id.*)

        In a decision dated November 26, 2004, the ALJ found that plaintiff was not

disabled.  (T. 13-19).  The ALJ's decision became the final decision of the

Commissioner when the Appeals Council denied plaintiff's request for review on April 7, 2006.  (T. 7-10).

## CONTENTIONS

The plaintiff makes the following claims:

(1) The ALJ failed to consider the severity of plaintiff's compression fractures at L1, L3, and T-12.  (Plaintiff's Brief, 13-15).

(2) The ALJ violated the treating physician rule.  (Plaintiff's Brief, 15-18).

(3) The ALJ's assessment of plaintiff's physical residual functional capacity ("RFC") is not supported by substantial evidence in the record and the ALJ failed to make a finding as to the physical and mental demands of his past work. (Plaintiff's Brief, 18-23).

(4) The ALJ failed to find that plaintiff was disabled under the framework of the Medical-Vocational Rules.  (Plaintiff's Brief, 23).

The defendant argues that the Commissioner's determination is supported by substantial evidence in the record, and must be affirmed.

## FACTS

**A.     Non-Medical Evidence and Testimony**

Plaintiff, who was 55 years old at the time the ALJ rendered his decision, has a high school education.  (T. 29, 52, 65, 377).  Plaintiff worked as a maintenance laborer, construction laborer, machine operator, and superintendent of a building.  (T. 59, 79).  Plaintiff testified that he additionally took a training course in truck driving and obtained a commercial driver's license, although he no longer held that license. (T. 377-78).  Plaintiff stated that in the mid-1990's, he began drinking and became an alcoholic.  (T. 378-80).  He also stated he suffered from depression.  (T. at 380).

2

Plaintiff stated that he was previously employed in the construction industry and was also self-employed in the same field for a period of time. (T. 378-81, 383). Plaintiff testified that he stopped working in June 2001 after he fell off of a roof. (T. 383, 388). Plaintiff stated that he injured his neck and back and subsequently was also treated for arthritis, seizures, hypertension, and a possible heart condition. (T. 383-84, 387).

Plaintiff stated that he currently lives in a rooming house in an old converted hotel. (T. 381). He noted that he has kitchen privileges and cooks one meal a day but that he normally eats breakfast and lunch at the community center of the Salvation Army. (T. 384). Plaintiff testified that on a typical day, he takes care of his personal needs, goes out to eat breakfast, reads the paper, goes to the library two or three times a week, and takes walks, although he is unable to do so lately due to his arthritis. (T. 385-86). He stated that he walks to the supermarket, which is approximately two and one-half blocks from his rooming house, cooks meals that are easy to prepare, and helps out at the Salvation Army by picking up dishes. (T. 386). In regards to household chores, plaintiff testified that he was mainly responsible for cleaning his room and bathroom as well as the kitchen if he would make meals. (T. 385). He further stated that at night, he would mainly watch television, read, and occasionally take walks. (T. 386).

When asked about his physical capabilities, plaintiff responded that he cannot lift more than five to ten pounds. (T. 389). He stated that he has trouble walking long distances and sitting and standing for long periods due to spasms, stiffness, and

soreness.  (*Id.*)  Plaintiff further testified that he has trouble gripping and cannot do fine manipulation.  (T. 390).

**B.    Medical Evidence**

**1. William E. Downey, Physician's Assistant**

William E. Downey, a physician's assistant with the Pulaski Health Center, examined and treated plaintiff from February 2001 through August 2002.  (T. 122-38, 149-57).  Downey noted previous high cholesterol levels, a history of gastroesophageal reflux disease ("GERD") and hypertension, as well as increased blood sugar levels.  (T. 122-24).  Physical exams in February 2001 revealed a clear chest, a regular heart rate, and no pretibial edema in his extremities.  (T. 123, 125-26).  Plaintiff was prescribed Clonidine for his hypertension, which Downey stated was under control with the medication.  (T. 124-26).

In January 2002, Downey stated that he was examining plaintiff as a follow-up to a hospital stay due to binge drinking around Christmas time.[1]  (T. 128).  A physical exam showed a clear chest, regular heart rate, and no edema.  (*Id.*)  Downey noted that plaintiff's hypertension was poorly controlled and he was suffering from alcoholism and depression.  (T. 129).  Toprol was prescribed.  (*Id.*)  In July 2002, a physical exam revealed a normal neck exam and normal gait, station, joint inspection, range of motion, joint stability, and muscle strength and tone.  (T. 133).  A mental exam also showed that plaintiff had normal judgment and insight, orientation, memory, mood,

---

[1] On December 27, 2001, plaintiff was admitted to the Samaritan Medical Center after drinking continuously for four or five days.  (T. 189-222).  This caused him to be kicked out of the adult home where he had been living.  (T. 203).  On January 3, 2002, plaintiff was discharged and diagnosed with delirium tremens secondary to alcohol withdrawal.  (*Id.*)

and affect.  (*Id.*)

### 2.  Drs. William Mahon and H. Douglas Wilson, Oswego Hospital

On June 6, 2001, plaintiff was admitted to the Oswego Hospital and treated by Dr. William Mahon after falling from his roof the day before.  (T. 141).  The physical examination revealed limited range of motion of the neck and shoulders, tenderness to palpation over the cervical, thoracic, and lumbar spine, and pain in the left foot.  (*Id.*) Dr. Mahon noted that plaintiff was capable of active motion of all joints in the upper and lower extremities and that there was no gross neurological defect.  (*Id.*)  Dr. Mahon reported that x-rays taken of the cervical spine showed degenerative changes and  compression fractures of the T12 and L1 vertebral bodies.  (*Id.*)  He diagnosed plaintiff with multiple contusions with post traumatic myalgias and compression fractures and recommended bed rest followed by a gradual increase in activities.  (*Id.*) On July 10, 2001, Dr. Mahon ordered x-rays of the left ankle and heel which showed no acute fracture or dislocation.  (T. 145).  On July 21, 2001, an x-ray of the thoracic and lumbar spine showed a slight increase in the amount of compression of the T12 and L1 vertebral bodies, a probable fracture involving the L3 vertebral body, and changes of lumbar spondylosis.  (T. 148).

In follow-up visits at the request of Dr. H. Douglas Wilson, the attending physician at Oswego Hospital, it was noted that plaintiff was doing better and comfortably ambulating.  (T. 143).  On July 30, 2001, six weeks after the accident, it was reported that while plaintiff complained of chest pain and muscular discomfort, he had no lower back pain or radicular symptoms, range of motion in the thoracic and

lumbar spine was restricted, there was no paravertebral discomfort, straight leg raising was negative, and there was some tenderness in the left foot. (*Id.*) X-rays showed healing of the compression fractures. (*Id.*) On August 31, 2001, it was noted that plaintiff had a slight restriction of flexion and extension, there was no tenderness to palpation over the spine, there was no back or leg pain with straight leg raising, which was negative, there was no evidence of neurological deficit, he improved and increased his activity level, and he would be capable of returning to work in a few weeks. (*Id.*) In October 2001, it was reported that ***plaintiff had returned to work activities***, there was no pain or tenderness at the fracture sites, there was some muscular discomfort in the paracervical muscles, and there was no evidence of neurological deficit or radiculopathy. (T. 144).

In March 2002, it was noted that plaintiff returned to full activities, there were no reports of radicular symptoms in the upper or lower extremities, there was full range of motion of the spine and extremities, straight leg raising was negative with no pain, there was no reflex or sensory deficit in the extremities, and there was no gross motor weakness. (*Id.*) The diagnosis was ***healed compression fractures of T-12, L1, and L-3 with post-traumatic myalgias***. (*Id.*) No further orthopedic intervention was indicated. (*Id.*) In October 2002, Dr. Wilson restarted plaintiff on Clonidine.[2] (T. 223). In his October 2002 notes, and the following month, Dr. Wilson opined that plaintiff was totally disabled with respect to the type of work he had done in the past. (T. 223, 224). Dr. Wilson's notes state that plaintiff

---

[2] An x-ray of the lumbar sacral spine taken in October 2002 showed disc space narrowing and wedging at T12 and L1. (T. 168).

> [i]s applying for social security disability and this would appear to be appropriate as he does appear to be disabled *for the type of work that he has done in the past* (emphasis supplied).  (T. 223).

This seems to indicate that Dr. Wilson believed that inability to perform past work would qualify the plaintiff for Social Security Disability.  This is not the standard for Social Security Disability.

On February 3, 2003, Dr. Wilson noted that plaintiff had fallen again and suffered a subdural hematoma but was treated and discharged by University Hospital in Syracuse.  (T. 226, 235-52).  Dr. Wilson indicated that plaintiff was suffering from post traumatic headaches and that his cholesterol was high.  (*Id.*)  Plaintiff was prescribed Lopid and Tylenol # 3.  (*Id.*)  In June 2003, plaintiff's medications were renewed and he was further given Darvocet for the headaches.[3]  (T. 229).  In September 2003, Dr. Wilson noted that plaintiff had been to the emergency room with a bout of alcohol excess but that plaintiff claimed he had not had a drink since that time.  (T. 231).

In January 2004, plaintiff stated he had increased neck and back pain due to the cold weather and he was prescribed Darvocet and Norflex.  (T. 234).  Dr. Wilson also started plaintiff on Zestoretic and Crestor for his hypertension and hyperlipidemia, respectively.  (*Id.*)  On April 22, 2004, some fifteen months after plaintiff's last insured date (T. 19, 376), Dr. Wilson completed a physical medical source statement.  (T. 256-60).  He opined that plaintiff was capable of tolerating low stress jobs, he

---

[3] It was noted that plaintiff went a month without medications because he was having problems with Medicaid.  (T. 229).

could only walk one to two blocks without severe pain, he could sit and stand for

thirty minutes at a time, and he could only sit, stand, and walk for about two hours in

an eight-hour workday. (T. 257-58). Dr. Wilson also stated that plaintiff would need

to shift positions during the day, walk for five minutes every thirty minutes, and take

unscheduled breaks every two hours for ten minutes. (T. 258). He further opined that

plaintiff could occasionally lift and carry less than ten pounds, occasionally climb

stairs, rarely twist and bend, never crouch or climb ladders, and that he would be

absent about four days a month. (T. 259). Dr. Wilson stated that plaintiff's emotional

conditions did not contribute to the severity of his symptoms or functional limitations.

(T. 257).

### 3.  **Jeanne A. Shapiro, Ph. D., State Agency Consultant**

On October 7, 2002, plaintiff was consultatively examined by Jeanne Shapiro,

Ph. D., a consulting psychologist. (T. 158-62). In a lengthy report, Dr. Shapiro

commented on plaintiff's psychiatric history, current functioning, medical and family

history, and performed a mental status examination. (*Id.*) Dr. Shapiro noted that

plaintiff did not report any significant depressive, manic, or anxiety related symptoms

and that he was effectively being treated. (T. 159).

Dr. Shapiro reported that plaintiff was cooperative during the interview, his

speech fluent, and his thought processes were coherent and goal directed without

evidence of any disordered thinking. (T. 160). Plaintiff's mood was calm and his

affect was congruent with his thoughts and speech, which was of full range. (*Id.*) Dr.

Shapiro found that plaintiff's attention and concentration and recent and remote

memory skills were intact and his insight and judgment were fair.  (*Id.*)  She noted that plaintiff could dress, bathe, and groom himself, cook, clean, do laundry, go shopping, manage money, and take public transportation.  (T. 160-61).  Dr. Shapiro also stated that plaintiff could attend and concentrate, read, write, perform simple calculations, and interact appropriately socially.  (T. 161).

Dr. Shapiro diagnosed plaintiff with alcohol abuse in early full remission. (*Id.*) Dr. Shapiro found that plaintiff

> appear[ed] to be capable of the following: understanding, and remembering simple instructions and directions.  He appears to capable of performing simple and some complex tasks with supervision and independently.  He appears to capable of maintaining attention and concentration for tasks and regularly attending to a routine and maintaining a schedule.  He appears to be capable of making some appropriate decisions.  He appears to be capable of learning new tasks.  He appears to be able to relate to and interact appropriately with others. He appears to be capable of dealing with stress.

(*Id.*)  Dr. Shapiro commented that the results of her examination did not appear to be consistent with any psychiatric problems that would significantly interfere with plaintiff's ability to function on a daily basis.  (*Id.*)

### 4.  **Dr. Berton Shayevitz, State Agency Consultative Examiner**

On October 28, 2002, plaintiff was consultatively examined by Dr. Berton Shayevitz.  (T. 163-67).  In a report, Dr. Shayevitz noted that plaintiff was able to cook, clean, do laundry, shop, manage money, socialize, shower, bathe, and dress himself, watch television, listen to the radio, and read.  (T. 164).  Upon physically examining plaintiff, Dr. Shayevitz found he was in no acute distress, gait and stance

were normal, squat was full but his knees crackled, he could walk on heels and toes without difficulty, he needed no help getting on and off the examining table or changing for the exam, and he could rise from a chair without difficulty.  (T. 165).

Dr. Shayevitz reported that there was limited range of motion of the cervical and lumbar spine, straight leg raising was to 70 degrees, there was full range of motion of the shoulders, elbows, forearms, wrists, hips, knees, and ankles bilaterally, strength was 5/5 in the lower and upper extremities, joints were stable and nontender, deep tendon reflexes were equal, there was no motor or sensory deficits, hand and finger dexterity was intact, and grip strength was 5/5.  (T. 166).

Dr. Shayevitz stated plaintiff's prognosis was stable to possibly slowly progressive.  (T. 167).  Dr. Shayevitz opined that plaintiff was moderately limited in the use of his neck and low back in terms of bending, twisting, turning, lifting, carrying, prolonged sitting, and climbing.  (*Id.*)

## 5.  **State Agency Consultant**

On November 6, 2002, a Physical RFC Assessment was completed.  (T. 169-74).  This RFC indicated that plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, and stand, sit, and walk for six hours during an eight-hour work day.  (T. 170).  The RFC further indicated that plaintiff had no limitations in pushing or pulling and he had no postural, manipulative, visual, communicative, nor environmental limitations.  (T. 170-72).

### 6. **Dr. Carlos Gieseken, State Agency Consultant**

Dr. Carlos Gieseken, a state agency consultative examiner, completed a Psychiatric Review Technique Form on November 21, 2002. (T. 175-88). The Psychiatric Review Technique form is a form used to determine whether a plaintiff meets a listed impairment, whereas a Mental RFC form is used to determine the functional limitations that a plaintiff's impairments place on his/her ability to work.

As a result of completing the Psychiatric Review Technique form, Dr. Gieseken found that plaintiff's impairment was not severe and that a coexisting non-mental impairment required referral to another medical specialty. (T. 175). Dr. Gieseken further noted that plaintiff had only mild restrictions of activities of daily living and difficulty in maintaining social functioning, concentration, persistence, or pace. (T. 185). He found insufficient evidence of repeated episodes of decompensation. (*Id.*)

### 7. **Dr. Moses Kyobe, NY Heart Center**

In April 2004, Dr. Moses Kyobe examined plaintiff for high blood pressure and chest pain. (T. 261). Dr. Kyobe noted that plaintiff was ***not*** limited in his activities of daily living and did not feel any chest discomfort at rest. (*Id.*) His physical exam revealed normal findings but Dr. Kyobe stated that plaintiff's hypertension was not well controlled, his cholesterol was high, and he had mildly elevated liver functions. (T. 262-63).

On May 3, 2004, Dr. Kyobe examined plaintiff and found he was in no

respiratory distress.  (T. 292).  He stated, however, that plaintiff suffered from atypical chest discomfort and ordered a stress test.  (*Id.*)  The same day, Dr. Kyobe completed a cardiac medical source statement.  (T. 265-69).  This form was apparently sent to Dr. Kyobe by plaintiff's counsel since it is similar to a form completed by Dr. Wilson, and contains many questions which allow only for a "yes" or "no" answer.  In addition, some of the very important questions, such as the question about whether plaintiff has "*marked limitation of physical activity as demonstrated by fatigue, etc.*" does not contain room for an explanation, and contains many possibilities for "marked limitation of physical activity" without distinguishing between those different factors.  Even if answered in the affirmative, the question clearly covers *many* separate possibilities that are not explained.  Interestingly, Dr. Kyobe did not answer Question Number Six regarding the credibility of the plaintiff.

The record shows that Dr. Kyobe first examined plaintiff in April 2004, and does not appear to have had any contact with the plaintiff prior to April 2004.  During plaintiff's visit to Dr. Kyobe in April 2004, Dr. Kyobe stated that "he is not limited in his activities of daily living.  He has not had any chest discomfort at rest, no light headedness, no palpitations, no lower extremity edema or cramping."  (T. 261).  Plaintiff did visit the New York Heart Center in January and February *2002* when he was examined by Dr. Jorge M. Davidenko.  (T. 149-57).  During the visit on January 17, 2002, plaintiff complained to Dr. Davidenko about shortness of breath and fatigue

upon exertion.  Dr. Davidenko found that plaintiff's EKG Exam was within normal limits, and his blood pressure was "borderline" at 144/88.  (T. 151).  Other cardiac tests were essentially normal, or had mild findings.  (T. 152, 157).  Based on 2002 records of the New York Heart Center and Dr. Kyobe's records of April and May 2004, it is unclear how Dr. Kyobe reached the conclusions he did about the marked restrictions and limitations on plaintiff's activities.  Dr. Kyobe commented on many aspects of physical and mental function similar to a comprehensive Functional Capacity Evaluation.  It does not appear that a Functional Capacity Evaluation was prepared.

Dr. Kyobe stated that plaintiff was capable of a low stress job, his physical symptoms caused emotional difficulties, and emotional factors contributed to the severity of his functional limitations.  (T. 266).  Dr. Kyobe opined that plaintiff could only walk three blocks without severe pain and sit, stand, and walk for less than two hours in an eight-hour workday.  (T. 267).  He also stated that plaintiff would need to shift positions during the day, take unscheduled breaks every twenty minutes for five to ten minutes, and elevate his legs.  (T. 268).  Dr. Kyobe further opined that plaintiff could frequently lift and carry less than ten pounds and bend and twist for forty percent of the day.  (*Id.*)  Dr. Kyobe concluded that plaintiff should avoid concentrated exposure to extreme heat and cold, high humidity, perfumes, soldering fluxes, solvents/cleaners, and chemicals and all exposure to fumes, odors, dusts, gases, and

cigarette smoke and that he would be absent from work twice a month.  (T. 268-69).

### 8.  Dr. Vilas Patil, Chief of Psychiatric Services

Dr. Vilas Patil, along with staff psychiatrist Dr. Lakshman Prasad, evaluated and treated plaintiff's depression from December 1, 2000 until March 30, 2004.  (T. 270-86, 334-45).  On December 1, 2000, Dr. Patil stated that plaintiff's mood was neutral, affect was appropriate, and there were no suicidal ideations, delusions, hallucinations, current feelings of depression, or cognitive deficits.  (T. 338).  He diagnosed plaintiff with dysthymic disorder, late onset, and secondary alcohol dependence, continuous, and assessed a Global Assessment of Functioning ("GAF")[4] score of 65, which indicates the existence of some mild symptoms or some difficulty in social, occupational, or school functioning, but generally means that the individual is functioning pretty well and has some meaningful interpersonal relationships.[5]  (*Id.*)  Dr. Patil prescribed Prozac and Clonidine.  (*Id.*)  On December 7, 2000, Dr. Prasad noted that plaintiff was feeling good about his employment opportunities and life and did not have any interest in further intervention.  (T. 335).

In February 2001, Dr. Prasad stated that plaintiff's mood was neutral, he was not suicidal, he was oriented and showed normal memory, and there was no evidence

---

[4] The Global Assessment of Functioning ("GAF") scale considers psychological, social, and occupational functioning on a hypothetical continuum of mental health.  DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (American Psychiatric Association, 4th Ed. Text Revision 2000) ("DSM-IV-TR").

[5] *See* DSM-IV-TR 34.

of delusions or hallucinations.  (T. 339).  A GAF score of 60[6] was assessed and

plaintiff was diagnosed with dysthymia, late onset, and secondary alcohol dependence,

in temporary remission.  (*Id.*)  Thereafter, on May 7, 2002, Dr. Patil found that

plaintiff's mood was neutral, affect was appropriate, and there were no suicidal

ideations, delusions, hallucinations, current feelings of depression, or cognitive

deficits.  (T. 272).  Dr. Patil also assessed a GAF score of 65, diagnosed plaintiff with

dysthymic disorder, late onset, and secondary alcohol dependence in partial remission,

and prescribed Prozac and Desyrel.  (*Id.*)

On August 29, 2002, Dr. Patil stated that plaintiff's mood was neutral, affect

was appropriate, there were no suicidal ideations, delusions, or hallucinations, he had

some feelings of anxiety and depression, and there were no cognitive deficits.  (T.

275).  At that time, plaintiff received the same diagnosis, GAF score, and medication

as detailed in his May 2002 evaluation.  (T. 275-76).  The same findings were made in

October 2002 apart from the fact that plaintiff denied having feelings of depression at

the time.  (T. 277).  In November 2002, it was noted that plaintiff's insight and

judgment were appropriate, he was coherent, alert, and oriented, recent and remote

memory were appropriate, and there was no indication of delusions or hallucinations.

(T. 278).

In February 2003, Dr. Patil stated that plaintiff was sleeping well and

---

[6] A GAF score between 51 and 60 indicates moderate symptoms or any moderate
difficulty in social, occupational, or school functioning.  DSM-IV-TR 34.

maintaining good physical health.  (T. 279).  He also reported that plaintiff had no

feelings of depression and there was no evidence of suicidal ideations, delusions,

hallucinations, or cognitive deficits.  (*Id.*)  In June 2003, Dr. Patil made the same

findings except for a note that plaintiff felt anxiety because his Medicaid was

cancelled.  (T. 280).

   The following month, plaintiff was admitted to Oswego Hospital after being

found passed out under a bridge.  (T. 281-83).  Dr. Patil noted that after plaintiff

sobered up, he was fine.  (T. 282).  He stated that plaintiff's mood was neutral, affect

was appropriate, there were no feelings of depression, he was oriented, and there were

no cognitive deficits noted.  (T. 283).  He was again diagnosed with dysthymic

disorder, late onset, and secondary alcohol dependence in partial remission and given

a GAF score of 65.  (*Id.*)  In November 2003, plaintiff stated he was feeling depressed

and Dr. Patil noted that plaintiff was oriented and there were no cognitive deficits.  (T.

285).  On December 1, 2003, Dr. Patil stated that plaintiff denied having persistent

feelings of depression, he was oriented, and there were no suicidal ideations or

cognitive deficits.  (T. 286).

   On March 30, 2004, it was noted that plaintiff had appropriate daily living and

interpersonal skills and his prognosis was good.  (T. 343).  Plaintiff was found to have

a neutral mood, appropriate affect, and no current feelings of depression.  (T. 344).

Dr. Patil stated that plaintiff's alcohol abuse was in sustained remission and further

diagnosed him with personality disorder with some dependent traits. (*Id.*)  A GAF score of 65 was assessed.  (*Id.*)  On July 8, ***2004***, eighteen months after plaintiff's last insured date, Dr. Patil completed a mental medical source statement on plaintiff's ability to do work-related activities. (T. 346-48).  He found that plaintiff had a fair ability to: 1) understand, remember, and carry out very short and simple instructions; 2) maintain regular attendance and be punctual within customary, usually strict tolerances; 3) make simple work-related decisions; 4) ask simple questions or request assistance; 5) accept instructions and respond appropriately to criticism from supervisors; 6) be aware of normal hazards and take appropriate precautions; 7) set realistic goals and make plans independently of others; 8) interact appropriately with the general public; 9) maintain socially appropriate behavior; and 10) adhere to basic standards of neatness and cleanliness.  (T. 346-47). Dr. Patil then stated that plaintiff had no or a poor ability to: 1) remember work-like procedures; 2) maintain attention for a two hour segment; 3) sustain an ordinary routine without special supervision; 4) work in coordination with or proximity to others without being unduly distracted; 5) complete a normal workday and workweek without interruptions from psychologically based symptoms; 6) perform at a consistent pace without an unreasonable number and length of rest periods; 7) get along with co-workers or peers without unduly distracting them; 8) respond appropriately to changes in the work setting; 9) deal with normal work stress; 10) understand, remember, and carry out detailed instructions; and

17

11) travel in unfamiliar places and use public transportation.  (*Id.*)  He opined that plaintiff would be absent more than three times per month due to his mental impairment.  (T. 348).

### 9. **Dr. Patsy Iannolo, Oswego Hospital**

In May 2002, plaintiff was found drunk underneath a bridge and was brought to Oswego Hospital.  (T. 298).  At that time, Dr. Patsy Iannolo stated that plaintiff was alert but intoxicated, his anterior neck was within normal limits, he had no tenderness to palpation in either upper or lower extremity, he was neurologically intact, and the LS spine was tender at L5 and S1.  (*Id.*)  Subsequently, in April 2003, plaintiff was brought to Oswego Hospital after being found by the police.  (T. 308).  Dr. Iannolo found that motor and sensory were intact in all four extremities and straight leg raising was completed without pain.  (*Id.*)  An x-ray of his cervical spine showed no fractures or dislocations between C1 and C6 and normal height and alignment with minimal osteophyte formation at C4/5 and significant osteophyte formation with joint space narrowing between C4 and C6 on the right side.  (T. 310).  An x-ray of the lumbosacral spine revealed mild compressions of T12 and L1 vertebral bodies with the remaining having normal height and alignment, mild narrowing at L4 and S1, osteophyte formation at L1, L3, and L4 levels, and subchondral sclerosis at the L5 and S1 facet joints.  (T. 310-11).  Additionally, a CT of his brain showed no evidence of intracranial hemorrhage.  (T. 312).

**DISCUSSION**

1.   **Disability Standard**

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months ...."  42 U.S.C. § 1382c(a)(3)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. §§ 404.1520 and 416.920 to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; ... .  Assuming the claimant does

19

> not have listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920.

The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that his impairment prevents him from performing his past work, the burden then shifts to the Commissioner to prove the final step. *Bluvband v. Heckler*, 730 F.2d 886, 891 (2d Cir. 1984).

**2.    Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision.  *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson*, 817 F.2d at 986.  In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision.  *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).  A court's factual review of the Commissioner's final  decision is limited to the determination of whether there is substantial evidence in the record to support the decision.  42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir.

1991).  "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citations omitted).  It must be "more than a scintilla" of evidence scattered throughout the administrative record.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 197 U.S. 229 (1938)).

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  *Williams*, 859 F.2d at 258.  However, a reviewing court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision.  *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).  *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983).

**3.**     **Severity of Impairments**

As mentioned above, if a claimant is not engaging in substantial gainful activity, then at step two of the sequential evaluation process a determination must be made as to whether a medically determinable physical or mental impairment exists.  20 C.F.R. §§ 404.1508, 416.908; *see also* Social Security Ruling ("S.S.R.") 96-4p, 1996 WL 374187, at *1-2, *Titles II and XVI: Symptoms, Medically Determinable Physical and Mental Impairments, and Exertional and Nonexertional Limitations*

21

(S.S.A. 1996).  An "impairment must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques . . . . [that] consist[] of signs, symptoms, and laboratory findings, not only by [a claimant's] statement of symptoms[.]"  20 C.F.R. §§ 404.1508, 416.908.

If a medically determinable impairment exists, a decision must be rendered as to whether it is a severe impairment that significantly limits the physical or mental ability to do basic work activities.  The ability to do basic work activities is defined as "the abilities and activities necessary to do most jobs."  20 C.F.R. §§ 404.1521(b), 416.921(b).  Basic work activities which are relevant for evaluating the severity of an impairment include:

> (1) Physical functions such as walking, standing, lifting, pushing, pulling, reaching, carrying, or handling;
> (2) Capacities for seeing, hearing, and speaking;
> (3) Understanding, carrying out, and remembering simple instructions;
> (4) Use of judgment;
> (5) Responding appropriately to supervision, co-workers and usual work situations; and
> (6) Dealing with changes in a routine work setting.

20 C.F.R. §§ 404.1521(b), 416.921(b); *see Pickering v. Chater*, 951 F. Supp. 418, 424 (S.D.N.Y.1996); *see also* S.S.R. 85-28, 1985 WL 56856, at *3-4, *Titles II and XVI: Medical Impairments That Are Not Severe* (S.S.A. 1985).

 Age, education, and work experience are not evaluated in determining if the impairment or combination of impairments are severe.  20 C.F.R. §§ 404.1520(c), 416.920(c).  The severity analysis does no more than "screen out de minimis claims."

*Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995).  If the disability claim rises above the de minimis level, then further analysis is warranted.  *Id.*  Where a claimant alleges multiple impairments, the combined effects of all impairments must be considered, regardless of whether any impairment, if considered separately, would be of sufficient severity.  20 C.F.R. §§ 404.1523, 416.923; *Dixon*, 54 F.3d at 1031.

Here, the ALJ determined that plaintiff's depression secondary to alcohol abuse, degenerative disc disease of the lumbosacral spine at T12-L1, L4-5, and L5-S1, degenerative disc disease of the cervical spine at C4-5 with narrowing, and hypertension were severe impairments.  (T. 24).  The ALJ did not find any other claimed conditions to be severe.  (*Id.*)  However, plaintiff contends that the ALJ erred by failing to find that his compression fractures at L1, L3, and T12 were severe impairments.  The record does not support plaintiff's contention.

On June 6, 2001, a day after plaintiff fell off a roof, Dr. Mahon diagnosed him with multiple contusions with post traumatic myalgias and degenerative changes and compression fractures of T12 and L1 vertebral bodies.  (T. 141).  However, by October 1, 2001, plaintiff had returned to work activities and it was reported that he had no pain or tenderness at the fracture sites.  (T. 144).  Then, in March 2002, Dr. Wilson, plaintiff's treating physician, diagnosed him with ***healed compression fractures of T-12, L1, and L-3 with post-traumatic myalgias***.  (T. 144).  At that time, plaintiff had reported that he had returned to full activities and Dr. Wilson stated there were no reports of radicular symptoms in the upper or lower extremities, there was full range of motion of the spine and extremities, straight leg raising was negative with no

pain, there was no reflex or sensory deficit in the extremities, and there was no gross motor weakness.  (*Id.*)  Dr. Wilson also stated that no further orthopedic intervention was indicated.  (*Id.*)

This evidence supports a finding that plaintiff's ***healed*** compression fractures were not a severe impairment and did not significantly limit his physical ability to do basic work activities.  The ALJ concluded that plaintiff's degenerative disc disease of the lumbosacral spine at T12-L1, L4-5, and L5-S1 was a severe impairment.  This finding was part of the original diagnosis by Dr. Mahon in June 2001.  Thus, the ALJ did not err in making his step two determination and it is supported by substantial evidence.

4.    **Treating Physicians and Residual Functional Capacity (RFC)**

While a treating physician's opinion is not binding on the Commissioner, the opinion must be given controlling weight when it is well supported by medical findings and ***not inconsistent with other substantial evidence***.  *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. §§ 404.1527(d), 416.927(d).  If the treating physician's opinion is contradicted by other substantial evidence, the ALJ is ***not*** required to give the opinion controlling weight.  *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).  The ALJ must, however, properly analyze the reasons that the report is rejected.  *Id.*  An ALJ may not arbitrarily substitute his own judgment for competent medical opinion.  *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

In rendering a residual functional capacity (RFC) determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts,

as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations.  20 C.F.R §§ 404.1545, 416.945; *see Martona v. Apfel*, 70 F. Supp. 2d 145 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)). An ALJ must specify the functions plaintiff is capable of performing, and ***may not simply make conclusory statements regarding a plaintiff's capacities***. *Verginio v. Apfel*, 1998 WL 743706 (N.D.N.Y. Oct. 23, 1998); *LaPorta v. Bowen*, 737 F. Supp. at 183.

In this case, the ALJ found that plaintiff had the RFC for a wide range of medium work.[7]  (T. 26).  Specifically, the ALJ stated that plaintiff could lift and/or carry fifty pounds occasionally and twenty-five pounds frequently, stand, walk, and sit for six hours in an eight-hour workday, and push and/or pull unlimitedly "as shown for lifting and carrying."  (*Id.*)  The ALJ further concluded that plaintiff was capable of: 1) understanding and remembering simple instructions and directions; 2) performing simple and some complex tasks with supervision and independently; 3) maintaining attention and concentration for tasks; 4) regularly attending to a routine and maintaining a schedule; 5) making some appropriate decisions; 6) learning new tasks; 7) relating and interacting appropriately with others; and 8) dealing with stress. (T. 26-27).

In making this determination, the ALJ accorded little weight to the mental RFC assessment opined by Dr. Patil, and little weight to Dr. Wilson's physical medical

---

[7] Medium work involves "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can also do sedentary and light work."  20 C.F.R. §§ 404.1567(c), 416.967(c).

source statement.  (T. 25-26).  Plaintiff argues that the ALJ did not give proper weight to the opinions of Drs. Patil, Wilson, and Kyobe and instead substituted his own opinion for that of the treating sources.  The ALJ generally found that the opinions deserved little weight because they were contrary to the record.  (*Id.*)  This court finds that the ALJ's conclusion is supported by substantial evidence in the record.  The court notes that the medical assessments of Drs. Wilson and Kyobe were prepared during 2004, well after the last date on which plaintiff was insured.  Although Dr. Kyobe's form states in response to a question in bold type that plaintiff's condition existed "since 06/05/2001."  (T. 269).  Dr. Kyobe did ***not treat plaintiff during 2001, 2002, 2003.***  No facts are given to support this retrospective opinion, and this opinion is clearly inconsistent with Dr. Kyobe's recitation that plaintiff reported no limitations in plaintiff's activities in daily living.  (T. 261).  The form also contains opinions by Dr. Kyobe about plaintiff's emotional conditions.  These questions appear to be outside of Dr. Kyobe's expertise.  (T. 265-69).

In regards to plaintiff's mental issues, the ALJ acknowledged that plaintiff has a mental condition that limits his ability to work.  The issue is the extent of that limitation and whether it precludes not only his past work, but any other substantial gainful activity.  Based upon the objective medical evidence in the record, it is clear that plaintiff's mental impairments did not significantly undermine his ability to do some work.  The ALJ considered plaintiff's mental limitations in determining his RFC and properly gave Dr. Patil's mental RFC assessment little weight.

As previously detailed, Dr. Patil's July 2004 assessment found that plaintiff's

26

mental capabilities were in the fair to poor range.  (T. 346-47).  Specifically, Dr. Patil opined that plaintiff had a fair ability to: 1) understand, remember, and carry out very short and simple instructions; 2) maintain regular attendance and be punctual within customary, usually strict tolerances; 3) make simple work-related decisions; 4) ask simple questions or request assistance; 5) accept instructions and respond appropriately to criticism from supervisors; 6) be aware of normal hazards and take appropriate precautions; 7) set realistic goals and make plans independently of others; 8) interact appropriately with the general public; 9) maintain socially appropriate behavior; and 10) adhere to basic standards of neatness and cleanliness.  (T. 346-47). He also found that plaintiff had no or a poor ability to: 1) remember work-like procedures; 2) maintain attention for a two hour segment; 3) sustain an ordinary routine without special supervision; 4) work in coordination with or proximity to others without being unduly distracted; 5) complete a normal workday and workweek without interruptions from psychologically based symptoms; 6) perform at a consistent pace without an unreasonable number and length of rest periods; 7) get along with co-workers or peers without unduly distracting them; 8) respond appropriately to changes in the work setting; 9) deal with normal work stress; 10) understand, remember, and carry out detailed instructions; and 11) travel in unfamiliar places and use public transportation.  (*Id.*)

These findings are contradicted by Dr. Patil's ***own treatment notes*** as well as the medical record as a whole.  On many occasions during his evaluations of plaintiff, Dr. Patil, and sometimes Dr. Prasad, found that plaintiff's mood was neutral, affect,

insight, and judgment were appropriate, and there were no suicidal ideations, delusions, hallucinations, or cognitive deficits.  (T. 272, 275, 277-79, 283, 286, 335, 338-39, 343-44).  Furthermore, Dr. Patil gave plaintiff a GAF score of 65, which again indicates the existence of some mild symptoms or some difficulty in social, occupational, or school functioning, but generally means that the individual is functioning reasonably well and has some meaningful interpersonal relationships.  (T. 272, 276, 283, 338, 344).  These findings conflict with Dr. Patil's overall conclusions.

Additionally, Dr. Shapiro opined that plaintiff was capable of understanding, and remembering simple instructions and directions, performing simple and some complex tasks with supervision and independently, maintaining attention and concentration for tasks, regularly attending to a routine, maintaining a schedule, making some appropriate decisions, learning new tasks, relating to and interacting appropriately with others, and dealing with stress.  (T. 161).  Dr. Shapiro concluded that the results of her examination did not appear to be consistent with any psychiatric problems that would significantly interfere with plaintiff's ability to function on a daily basis.  (*Id.*)  Dr. Gieseken also stated that plaintiff had only mild restrictions of daily living and difficulty in maintaining social functioning, concentration, persistence, or pace.  (T. 185).  Based on this evidence, not only did the ALJ properly accord Dr. Patil's opinion little weight, but his RFC determination regarding plaintiff's mental capabilities was supported by substantial evidence.

However, with respect to plaintiff's medical impediments, plaintiff argues that the ALJ failed to give proper weight to the opinions of Drs. Wilson and Kyobe

regarding his physical impairments.  Plaintiff further contends that in so doing, the ALJ improperly found that he could do medium work.

As previously stated, Dr. Wilson opined on April 22, 2004 that plaintiff could only walk one to two blocks without severe pain, sit and stand for thirty minutes at a time, and only sit, stand, and walk for about two hours in an eight-hour workday.  (T. 257-58).  Dr. Wilson also reported that plaintiff would need to shift positions during the day, walk for five minutes every thirty minutes, and take unscheduled breaks every two hours for ten minutes.  (T. 258).  He further concluded that plaintiff could occasionally lift and carry less than ten pounds, occasionally climb stairs, rarely twist and bend, never crouch or climb ladders, and that he would be absent about four days a month.  (T. 259).  As this court has previously noted, this assessment was on a form apparently supplied to Dr. Wilson by plaintiff's counsel, and was completed more than one year *after* plaintiff's last insured date.

Dr. Kyobe made similar findings at about the same time during 2004.  He stated that plaintiff could only walk three blocks without severe pain and sit, stand, and walk for less than two hours in an eight-hour workday.  (T. 267).  He also opined that plaintiff would need to shift positions during the day, take unscheduled breaks every twenty minutes for five to ten minutes, and elevate his legs.  (T. 268).  Dr. Kyobe further reported that plaintiff could frequently lift and carry less than ten pounds and bend and twist for forty percent of the day.  (*Id.*)  He concluded that plaintiff should avoid concentrated exposure to extreme heat and cold, high humidity, perfumes, soldering fluxes, solvents/cleaners, and chemicals and all exposure to fumes, odors,

dusts, gases, and cigarette smoke and that he would be absent from work twice a month.  (T. 268-69).  As noted above, it is unclear how Dr. Kyobe arrived at all of the restrictions that he placed on plaintiff.  Neither his notes, nor the 2002 notes of the New York Heart Center have information that would support these restrictions.  The record shows that Dr. Kyobe examined plaintiff only twice, on April 2, 2004 (T. 261) and May 3, 2004 (T. 291).  Dr. Kyobe's assessment on April 2, 2004 is that plaintiff had hypertension, which was not well controlled, "exertional and atypical angina with a normal stress echocardiogram *which is recent*" (emphasis added), elevated cholesterol levels, and mildly elevated liver function tests.  (T. 262-63).

Although the ALJ did not precisely state that he was giving Dr. Kyobe's opinion little weight, that inference can clearly be made.  (*See* T. 26).  Although it would have been much clearer if the ALJ stated what weight he was giving to Dr. Kyobe's opinion, it is clear that he rejected Dr. Kyobe's opinion since it was not supported by his own treatment records, the prior treatment by the New York Heart Center, and other medical evidence in the record.  *See Klodzinski v. Astrue*, No. 07-1752-cv, 2008 U.S. App. LEXIS 8772, *3-5 (2d Cir. April 23, 2008) (summary order) (although ALJ's decision could have been more specific, court could conclude based on its review of the record that the ALJ applied "the substance" of the treating physician rule).

Although plaintiff argues that the 2004 medical records and the 2004 opinions of plaintiff's level of function by Dr. Kyobe and Dr. Wilson support a finding of disability, the ALJ states in his opinion (T. 19, 27) and plaintiff's counsel agrees (T.

376) that for Social Security Insurance benefits, disability must be shown before December 31, 2002. It does not appear that there is any medical evidence supporting a finding of disability before December 31, 2002, and therefore, the ALJ's rejection of the opinions of Drs. Kyobe, Wilson, and Patil are supported by substantial evidence in the record.

The ALJ's finding regarding plaintiff's Residual Functional Capacity does not appear to be supported by reference to specific evidence in the record, and this court, therefore, will recommend a remand for that purpose. *See Viall v. Astrue*, 1:05-CV-527, 2008 U.S. Dist. LEXIS 8896, at *22-25 (N.D.N.Y. Feb. 5, 2008) (Kahn, J.) (remanding for failing to explain on what specific evidence the ALJ relied upon in making the RFC determination); S.S.R. 96-8p, 1996 WL 374184, at *7, *Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims* (S.S.A. 1996).

The ALJ concluded that plaintiff was capable of performing his past work as a building superintendent, maintenance assistant, and building maintenance repairer. (T. 27). The court notes that one of plaintiff's prior jobs was in the "light" work category, but the ALJ found plaintiff capable of "medium" level work. This should be clarified on remand. Although plaintiff contends that the ALJ did not follow Social Security Ruling 82-62, the record clearly shows what those jobs involve. *See* T. 59, 83, 84. The ALJ was justified in using the record to assess the physical or mental demands of plaintiff's past relevant work. This court finds no error in that regard.

The ALJ's finding regarding plaintiff's residual functional capacity needs to be clarified by specific reference to the record, and the court, therefore, will recommend a

remand.

**WHEREFORE,** based on the findings in the above Report, it is hereby

**RECOMMENDED,** that this matter be **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with the above.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: May 16, 2008

Hon. Gustave J. DiBianco
U.S. Magistrate Judge